MILLER, PITT, FELDMAN & MCANALLY, P.C.
One South Church Avenue, Suite 1000
Tucson, Arizona 85701
Peter Timoleon Limperis SBN 019175
Max W. Larnerd SBN 040607
(520) 792-3836
plimperis@mpfmlaw.com
mlarnerd@mpfmlaw.com
sfields@mpfmlaw.com – for minute entries
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Tierney,<br><br>                Plaintiff,<br><br>- vs -<br><br>City of Tempe, a political subdivision of the State of Arizona,<br><br>                Defendant. | Case No.: CV−26−00347−TUC−AMM (PSOT)<br><br>**PLAINTIFF'S NOTICE OF FILING FIRST AMENDED COMPLAINT AS A MATTER OF COURSE**<br><br>(Hon. Angela M. Martinez) |

Plaintiff Kathleen Tierney hereby gives notice that she is filing her First Amended Complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(A).

The First Amended Complaint is submitted in color and complies with LR Civ 7.1(c). No substantive changes have been made to the Complaint. The only changes, as indicated in the copy attached here pursuant to LRCiv 15.1(b), are that the document title has been updated, the case number and assigned judge have been added, and the signature date has been updated.

///

///

///

///

1

Respectfully submitted this 9th day of July 2026.

MILLER, PITT, FELDMAN & MCANALLY, P.C.

By:  /s/ Peter Timoleon Limperis
       Peter Timoleon Limperis
       Max W. Larnerd
       *Attorneys for Plaintiff*

# Exhibit 1

MILLER, PITT, FELDMAN & MCANALLY, P.C.
One South Church Avenue, Suite 1000
Tucson, Arizona 85701
Peter Timoleon Limperis SBN 019175
Max W. Larnerd SBN 040607
(520) 792-3836
plimperis@mpfmlaw.com
mlarnerd@mpfmlaw.com
sfields@mpfmlaw.com – for minute entries
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Tierney, | Case No.: CV−26−00347−TUC−AMM (PSOT) |
| Plaintiff, | |
| - vs - | **FIRST AMENDED COMPLAINT** |
| City of Tempe, a political subdivision of the State of Arizona, | |
| Defendant. | (Hon. Angela M. Martinez) |

### INTRODUCTION

1.    American political debate has never been required to be polite or restrained. Since before the founding of this country, pamphlets, political cartoons, town halls, and soapbox orators have carried sharp public criticism of those in power.

2.    In our modern civic life, much of that same debate now occurs on social media. The Supreme Court has recognized that today, "the most important places for the exchange of views" are "cyberspace" and "social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Facebook and similar platforms are where citizens follow local government, debate public policy, organize around civic issues, and speak directly to elected officials.

1

3. But while the medium has changed, the protection afforded by the Constitution has not. Online political speech remains protected even when it is irreverent, exaggerated, mocking, uncomfortable, or offensive.

4. This case arises from the Defendant City of Tempe's (the "City") treatment of protected political expression as a felony.

5. Ms. Tierney posted a *Game of Thrones* GIF in the comment section of a Tempe councilmember's public Facebook page during an ongoing debate about a city ordinance. The GIF depicted the fictional character Cersei holding a glass of wine and smirking while watching green smoke rise from a distant area in the fictional city around her.

6. The City, through Tempe Police Department ("TPD"), turned an innocuous Facebook comment into a humiliating and life-altering ordeal. It labeled her comment a "specific. . . and credible" threat to Tempe City Hall, somehow equating a digitally rendered medieval city from a fantasy television drama about dragons, knights, and dark magic with downtown Tempe.

7. TPD surveilled Ms. Tierney's Tucson home, arrested her outside it, searched her residence, and seized her digital devices. TPD then interrogated her, shackled her, transported her more than one hundred miles to Tempe, booked her into jail, and released her onto the street without her phone, wallet, or transportation home.

8. After that, TPD referred Ms. Tierney for felony prosecution. The City also publicly announced her arrest and released her mugshot to the media.

9. And, when the Maricopa County Attorney later declined to prosecute her, the City stood by its response, stating publicly that it would do the same thing to any other citizen "under similar circumstances."

### JURISDICTION AND VENUE

10. This action is brought pursuant to 42 U.S.C. § 1983 and Arizona common law.

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).

2

12.    A substantial part of the events giving rise to this action occurred in Pima County, Arizona.  Venue is proper in this Court's Tucson Division pursuant to 28 U.S.C. § 1391(b) and LRCiv 77.1(a).

13.    Plaintiff presented her claims to Defendant City of Tempe as required by Ariz. Rev. Stat. § 12-821.01 on February 25, 2026, within the time required by law.

14.     Defendant City of Tempe has not made any disposition of the claims, and the claims are deemed denied because more than sixty days have passed since they were filed. Ariz. Rev. Stat. § 12-821.01(E).

15.    This Complaint is being filed within the time required by law.

### PARTIES

16.    Plaintiff Kathleen "Kadi" Tierney is a single adult and a resident of Pima County, Arizona.

17.    Defendant City of Tempe is a political subdivision of the State of Arizona capable of being sued pursuant to Ariz. Rev. Stat. §§ 12-820(7), 821.01.

18.    The City operates through TPD and its officers, employees, and agents.

19.    The City's Chief of Police is a final policymaker concerning the acts of TPD. According to the Office of the Chief of Police's website, "The Office of the Chief provides overall leadership, vision, and direction for the department."[1]

20.    The City is liable for TPD's unconstitutional acts that were (1) undertaken pursuant to an official policy, custom, or practice or (2) later ratified by the City or a final policymaker, including the Chief of Police.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

A. Ms. Tierney's Personal Background

21.    Ms. Tierney's decades-long career has been in public affairs, political consulting, communications, and community engagement.

---

[1] https://www.tempe.gov/government/police/office-of-the-chief.

3

22. Over time, she specialized in municipal and county proposition campaigns, first in Pima County and later in Maricopa County.

23. Her work required her to closely follow public policy matters across Arizona, including in cities like Tempe.

24. Through that work, Ms. Tierney developed professional relationships with elected officials in Pima and Maricopa Counties, including members of the Tempe City Council (the "City Council").

25. In September 2024, while assisting with campaign efforts for a Maricopa County Board of Supervisors candidate, Ms. Tierney attended a political fundraiser where she was introduced to Tempe City Councilmember Randy Keating.

26. During a casual conversation with Councilmember Keating, Ms. Tierney learned that he had a dog named Cersei, a reference to the fictional character from the hit television show, *Game of Thrones*. Councilmember Keating mentioned that *Game of Thrones* was one of his favorite shows, and Ms. Tierney joked that the show's themes of palace intrigue, power, loyalty, and political maneuvering had obvious parallels to the world of local politics.

27. The interaction was memorable because Councilmember Keating's dog's name was unique and the conversation was lighthearted. The conversation provided the context for Ms. Tierney's later use of a Cersei GIF in a Facebook comment on Councilmember Keating's public page.

28. At the end of 2024, Ms. Tierney decided to step away from political fundraising and campaign consulting.

29. She accepted a public affairs position with a large telecommunications corporation and informed her professional network that she was no longer engaged in campaign work.

30. Although she left consulting, she continued to follow municipal policy debates as part of her professional interest in public affairs and local governance.

4

B.  The City's July 2025 Parks Ordinance and Referendum Petition

31.    In July 2025, the Tempe City Council unanimously approved a new ordinance imposing restrictions on gatherings in city parks.

32.    The ordinance drew significant public opposition from advocates and residents who believed the restrictions would limit community-based outreach and charitable activities in public spaces.

33.    Ms. Tierney followed the ordinance, and the public's reaction, from proposal through approval.

34.    She believed the City Council was wrong to disregard substantial public opposition.

35.    Drawing on her professional experience in proposition campaigns and local public affairs, Ms. Tierney believed the City Council's handling of the ordinance would undermine public confidence in local government and breed cynicism toward future public initiatives.

36.    After the ordinance passed, community members organized a referendum petition effort, which, if successful, would require the City Council to repeal the ordinance or submit it to a vote of the City electorate.

37.    However, Ms. Tierney became especially concerned by reports that individuals or organizations close to the City or the City Council were funding professional canvassing companies, including Groundswell Contact, to oppose the referendum campaign by discouraging Tempe citizens from signing the petition.[2]

---

[2] TJ L'Heureux, *Hired Mercenaries Are Blocking Tempe Petitioners. Who's Paying Them?*, Phoenix New Times (July 23, 2025), https://www.phoenixnewtimes.com/news/tempe-petition-opposed-paid-opposition-mysterious-backing-22163028/; Lee Shappell, *Tempe Parks-Permit Petition Drive Turns Lively in Closing Days*, Tempe Tribune (July 27, 2025), https://www.tempenews.com/news/tempe-parks-permit-petition-drive-turns-lively-in-closing-days/article_6b443d92-dd16-420b-8655-b2a93f31df36.html.

38. Despite that paid-for opposition, organizers gathered thousands of signatures within approximately one month, more than the number required to force the City Council to reconsider the ordinance or submit it to voters.

39. Ms. Tierney was in Tucson and did not participate directly in the petition effort.

40. From Facebook, it appeared to Ms. Tierney that a person named "Konner Culver" was among the most vocal people advocating that Tempe officials be held accountable.

41. Ms. Tierney's interest in the issue stemmed from her professional background and concern for the integrity of local governance and she viewed the petition effort as a praiseworthy example of grassroots civic engagement.

C. Ms. Tierney's August 28, 2025 Facebook Comment

42. The City Council scheduled a meeting for August 28, 2025, at which it would address the petition and vote on a motion to repeal the ordinance.

43. In the days leading up to that meeting, discussion on social media intensified.

44. On the evening of August 28, 2025, Ms. Tierney was at home in Tucson.

45. She commented on a post made by Councilmember Keating's public Facebook page. The post concerned the upcoming meeting, and Ms. Tierney made the comment from an account named "Kadi Marie," which was her nickname by which she is known and her middle name.

46. Ms. Tierney's comment stated, "Konner Culver watching tonight's council meeting."

///

///

///

///

///

///

6

47.    Ms. Tierney included a GIF[3] depicting a scene from *Game of Thrones*.  The GIF depicted the fictional character Cersei holding a glass of wine and smirking while watching green smoke rise from a distant area in the fictional city around her:



48.    Ms. Tierney selected the Cersei GIF because of her prior conversation with Councilmember Keating about the TV show and his dog's name.

49.    Ms. Tierney intended the post to convey, in exaggerated and humorous form, the public controversy surrounding the ordinance, the City Council's unpopular course of action, and the satisfaction activists likely felt after the rapid mobilization of the referendum petition. The comment referenced Konner Culver because he appeared to Ms. Tierney to be one of the people most active on Facebook in opposition to the parks ordinance.

50.    The post did not make any personal threats.

51.    The post did not mention a bomb, weapon, explosive, device, plan, time, method, or instruction.

52.    The post did not encourage anyone to engage in violence or disrupt the City Council meeting.

---

[3] "GIF" stands for Graphics Interchange Format.  It is a digital image format that is commonly used to display a short, soundless looping animation.  The photograph included in ¶ 47 is one frame from the GIF that Ms. Tierney posted.

53.    The post was not directed at Tempe City Hall.  Rather, the GIF depicted the fictional city of "King's Landing" from *Game of Thrones*, which was created with CGI and based on footage of Dubrovnik, a medieval walled city in Croatia:[4]





54.    Ms. Tierney had no intention of threatening anyone, disrupting the meeting, or causing the meeting to be canceled.

55.    After posting the comment, Ms. Tierney went about her evening in Tucson.

56.    She had no contact with anyone at the meeting.

57.    She did not learn that the City Council meeting had been canceled until a friend later informed her.

58.    Ms. Tierney was surprised and confused by the cancellation.

---

[4] rspvfx, *Rising Sun Pictures (RSP) – Game of Thrones Season 6 VFX Breakdowns*, YouTube, at 0:51 (July 25, 2016), https://youtu.be/3fPRK92TtIY?si=-vyuqJIIW_WrKs7s&t=51.

59.    She did not believe her comment could reasonably be interpreted as anything other than political commentary.

D.  The City's Reaction to the Facebook Comment

60.    Ms. Tierney's comment came to the attention of TPD after Councilmember Keating contacted TPD about it.

61.    In his report, TPD Officer Victor Barajas stated that the GIF depicted "a silhouetted person overlooking the valley, similar to the downtown area where the Tempe City council meeting was taking place, with a mushroom cloud erupting into the air, as if an explosion had occurred."

62.    His report concluded that "'Kadi Marie' committed Disorderly Conduct (ARS 13-2904A4) when they posted a photo on social media that depicted an explosion in the valley area, similar to Tempe City Hall, located at 31 E. 5th St. in Tempe, AZ, at the same time city council was congregating, leading the meeting to be cancelled."

63.    He also noted in his report that "[o]fficers conducted a sweep of the building, and at that time, no crime was established."  TPD also brought in a "bomb detecting K9" to sweep Tempe City Hall "and surrounding areas for potential devices, which prompted negative results."

64.    In effect, TPD equated a digitally rendered fantasy setting from a television drama about dragons, knights, and dark magic, with downtown Tempe and treated the fictional, green explosion emanating within that fantasy city as a credible threat to City Hall.

65.    Based on that interpretation, the City and TPD canceled the City Council meeting.

66.    The following day, the City publicly announced that the "concern was specific in nature and credible enough" that the meeting could not proceed.

E.  TPD's Investigation of the Comment

67.    TPD opened a criminal investigation into the Facebook comment.  On August 29, 2025, Detective Marra Guajardo was assigned the investigation.

9

68. As part of her investigation, Detective Guajardo reviewed the Facebook comment made by the "Kadi Marie" account. Detective Guajardo described the GIF as "a person watching an explosion in a city. . . from a TV show 'Game of Thrones' where a silhouetted person overlooks a valley with a densely populated city and a mushroom cloud erupting into the air as if an explosion had occurred."

69. Detective Guajardo next took steps to identify the person behind the "Kadi Marie" Facebook account and to investigate the "Konner Culver" account referenced in the post. She obtained multiple warrants relating to those accounts, including social media account information, subscriber information, IP address information, and related electronic records.

70. According to Detective Guajardo's report, the search warrant affidavit is "sealed outside the public record by the courts." Upon information and belief, the search warrant affidavit was based on the same facts set forth in TPD's reports, specifically Plaintiff's Facebook comment and the accompanying *Game of Thrones* GIF.

71. Through that process, Detective Guajardo identified Ms. Tierney as the person associated with the "Kadi Marie" account and identified the person associated with the "Konner Culver" account. Detective Guajardo also identified Ms. Tierney's phone number, email address, employment, professional background, internet service provider, and her Tucson address.

72. The investigation confirmed that Ms. Tierney had posted the Facebook comment. But it did not uncover evidence that she had any weapon, explosive, plan, accomplice, intent to travel to Tempe, communication with anyone at the meeting, or intent to threaten or harm anyone.

F. The City's Surveillance and Arrest of Ms. Tierney

73. The City first surveilled Ms. Tierney on September 18, 2025. TPD Sergeant J. Lomeli and Detective Matthew Moerland drove to Tucson and "observed [Ms. Tierney]

exiting her residence with her dogs and between 0700 – 0800 hours she was observed leaving the area in a company vehicle[.]"

74. On September 23, 2025, Detective Guajardo obtained a search warrant for Ms. Tierney's Tucson residence and her company's vehicle.

75. According to Detective Guajardo's report, the search warrant affidavit is "sealed outside the public record by the courts." Upon information and belief, the search warrant affidavit was based on the same facts set forth in TPD's reports, specifically Plaintiff's Facebook comment and the accompanying *Game of Thrones* GIF.

76. The next morning, Detective Guajardo requested assistance from Officer Matthew Hood of TPD's Criminal Apprehension and Surveillance Team to execute the search warrant and arrest Ms. Tierney. Officer Hood was also assigned to the United States Marshals Service AZ WANTED Violent Offender Task Force.

77. Detective Guajardo advised Officer Hood that probable cause existed to arrest Ms. Tierney for felony computer tampering (Ariz. Rev. Stat. § 13-2316(A)(5)), misdemeanor disorderly conduct (Ariz. Rev. Stat. § 13-2904(A)(4)), and misdemeanor threatening or intimidating (Ariz. Rev. Stat. § 13-1202(A)(2)).

78. At approximately 5:00 a.m. on September 24, 2025, Detective Guajardo, along with Officer Hood, members of the United States Marshals Service AZ WANTED Violent Offender Task Force, and other TPD officers, employees, and agents began surveillance of Ms. Tierney's home in Tucson.

79. They observed Ms. Tierney leave her residence with her dogs at approximately 6:30 a.m.

80. At approximately 7:50 a.m., TPD's officers, employees, and agents contacted Ms. Tierney outside her residence as she was unloading items from her vehicle.

81. Detective Guajardo handcuffed Ms. Tierney and placed her under arrest.

82. TPD's officers, employees, and agents, including Sergeant J. Lomeli, Detective Moerland, Detective E. Garcia, Detective Matthew DeCourval, and Forensic Services

11

Technician Gregory Roorda then entered Ms. Tierney's residence and executed the search warrant. Her cellphone, laptops, and other electronic evidence was seized from the home.

83.    After arresting Ms. Tierney, Detective Guajardo and Officer Hood transported her to the Tucson Police Department's headquarters.

84.    While being interviewed, Ms. Tierney explained that she used the *Game of Thrones* GIF because Councilmember Keating had a dog named Cersei.

85.    Ms. Tierney explained that the comment was intended as a joke about Konner Culver watching the Tempe City Council meeting.

86.    Ms. Tierney denied intending to threaten anyone, or to disrupt the City Council meeting.

87.    TPD's questioning focused heavily on Konner Culver. Ms. Tierney was repeatedly asked whether she knew him or had communicated with him.

88.    Ms. Tierney told officers that she had never met Konner Culver, had never communicated with him directly, and did not know who he was beyond seeing his public Facebook posts.

89.    The focus of the questioning suggested to Ms. Tierney that TPD's real motivation for investigating her was to identify and gather information about Konner Culver.

90.    After the interview, Detective Guajardo and Officer Hood placed Ms. Tierney in wrist and ankle shackles and then transported her from Tucson to Tempe.

91.    Ms. Tierney was booked into the Tempe City Jail. During booking, Ms. Tierney was searched, fingerprinted, and photographed.

92.    After booking, Ms. Tierney was released pending prosecution. She was released in Tempe without her cellphone, without her wallet, and without transportation back to Tucson.

93.    Ms. Tierney walked out of the building carrying a clear plastic bag containing only the jewelry she had worn that morning.

12

94.　When Ms. Tierney asked where she was, a security guard pointed toward the street and said, "Mill Avenue is that way."

95.　The irony was not lost on Ms. Tierney that she was released within walking distance of Tempe City Hall, the same building the City claimed was the target of her purported threat.

G.　The City Publicly Brands Ms. Tierney as a Threat

96.　Within approximately an hour of Ms. Tierney's release, the City publicly named Ms. Tierney in a prepared press release.　The City shared the press release on its official governmental Facebook page:



97.　The press release included a statement from TPD Chief Ken McCoy ratifying the TPD's actions.

98.　The City also distributed Ms. Tierney's mugshot to media outlets, which widely reported and circulated the City's statement and the mugshot.

///

13

H. TPD Refers Criminal Charges and the County Attorney Declines

99. TPD subsequently recommended that the Maricopa County Attorney file multiple criminal charges against Ms. Tierney, including one count of Computer Tampering, a Class 5 felony, one count of Class 1 Disorderly Conduct, and one count of Threatening or Intimidating causing serious public inconvenience.

100. For weeks, Ms. Tierney remained under the threat of felony prosecution.

101. During this time, TPD Chief McCoy continued to publicly defend TPD's response and to characterize Plaintiff's Facebook post as a threat. TPD Chief McCoy stated publicly that "[w]henever we see threats, we take them seriously," because "acts of violence are carried out, whether they're mass shootings or bombings," and that TPD's "team made the right decision based on the information they had."[5]

102. Ultimately, the Maricopa County Attorney declined to pursue the charges due to "no reasonable likelihood of conviction."

103. Rather than acknowledge error, the City publicly doubled down. It issued another public statement on December 11, 2025, acknowledging the County Attorney's decision but stating that the City "disagree[d] with the County Attorney's decision."

104. Although the City announced that it would not pursue the misdemeanor charges, it maintained that the investigation and arrest of Ms. Tierney remained "the right call." The City also characterized the Facebook comment as an "anonymous online post that looked like a direct threat," and asserted that its investigators "followed the facts where they led: to the door of the individual who created and posted the image that caused the Council meeting to be evacuated."

105. The City further suggested that the matter "might have concluded differently" had Ms. Tierney "come forward."

---

[5] Lee Shappell, *Tempe City Council 'Threat' May Have Been Bad Joke*, Tempe News (Nov. 23, 2025), https://www.tempenews.com/news/tempe-city-council-threat-may-have-been-bad-joke/article_05535821-7c88-4a81-90df-590de3555521.html.

14

106. The City ratified TPD's actions: "Our team acted appropriately based on the information available at the time."

107. The City ended its statement with: "Tempe will continue to take every threat seriously, safeguard our public spaces and meetings, and uphold the expectations our residents have for a secure and well-governed city."

108. After the Maricopa County Attorney declined charges, Chief McCoy and the City continued to defend TPD's response and the City's characterization of Plaintiff's post as a threat. He stated that "at the end of the day, it was Kathleen Tierney that made a threat through social media[.]" He further stated that TPD handled the incident responsibly, and that "the lesson might [be] to be careful with social-media posts, especially in connection with issues like the Tempe parks ordinance revisions[.]"[6]

109. On February 27, 2026, the City released a third press release addressing Ms. Tierney's notice of claim. In that statement, the City stated that "[a]s with any investigation, the Tempe Police Department followed established procedures. Ms. Tierney was treated no differently than any other member of the community under similar circumstances."

I. Ms. Tierney's Personal and Professional Fallout

110. Ms. Tierney suffered substantial economic, reputational, and emotional injuries as a direct result of the City's actions.

111. For more than twenty-five years, Ms. Tierney built her career in public affairs. Her livelihood depended on professional credibility, public trust, and relationships with elected officials and community stakeholders.

112. Being publicly branded as someone arrested for threatening a City Council meeting was uniquely damaging to Ms. Tierney's career and reputation.

---

[6] Lee Shappell, *Maricopa County Attorney Declines Charges in Tempe Council Threat*, Tempe News (Dec. 10, 2025), https://www.tempenews.com/news/maricopa-county-attorney-de-clines-charges-in-tempe-council-threat/article_d70f86b5-95b6-4058-bc2e-41ac888c6f5e.html.

113. Within days of her arrest and the distribution of the City's press release and her mugshot, Ms. Tierney's employer fired her. At the time, she was earning approximately $150,000 per year with full benefits.

114. In a single day, the City's public accusations destroyed decades of professional goodwill. Ms. Tierney has been rendered effectively unemployable in the field in which she spent her adult life.

115. Ms. Tierney's arrest and public branding caused a protracted interruption of her gainful employment in public affairs and civic engagement. She has not obtained full-time employment commensurate with the position, compensation, responsibilities, or professional standing she had before the City's actions.

116. Ms. Tierney also suffered substantial emotional distress, anxiety, humiliation, and fear. Her arrest, interrogation, and cross-county transport in shackles was unimaginably harrowing for someone who had never before been arrested.

117. For weeks after her arrest, Ms. Tierney lived under the threat of felony prosecution. During that time, she suffered sleeplessness, loss of appetite, persistent anxiety about her future, difficulty concentrating, and paralyzing embarrassment.

118. The public nature of the arrest intensified the harm. Friends, colleagues, professional contacts, and members of the civic community saw Ms. Tierney's name and mugshot associated with allegations of a "credible," "specific," and "dangerous" "threat" against a City Council meeting.

119. Ms. Tierney has limited her participation in online political discussion because she fears government officials may again punish her for protected speech.

## **COUNT 1**

**(First Amendment Retaliation, 42 U.S.C. § 1983)**
**Defendant City of Tempe**

120. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

16

121.    Plaintiff's federal claims are brought under 42 U.S.C. § 1983 against Defendant City of Tempe.  For each federal claim, Plaintiff alleges both (1) the violation of a particular constitutional right, and (2) municipal liability under *Monell v. N.Y.C. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978) because the violation was caused by City policy, custom, or practice, and was later ratified by a final policymaker, including the Chief of Police.  The City's *Monell* liability is pled fully in Count 5.

122.    Under the First Amendment, a citizen has the right to free expression, including on social media.  *See Packingham v. North Carolina*, 582 U.S. 98, 108 (2017).

123.    Plaintiff engaged in constitutionally protected speech when she posted the comment and *Game of Thrones* GIF on a City councilmember's public Facebook page during an ongoing public debate about a City ordinance and referendum petition.

124.    Plaintiff's post was political commentary about matters of public concern, including the park ordinance, the City Council's passage of that ordinance, the referendum effort that followed, and civic engagement in response to local government action.

125.    She had no reason to believe that any person might interpret her post as a threat to anyone or any place, and she did not "consciously disregard[] a substantial risk" that her communications would be viewed as threatening violence.  *Counterman v. Colorado*, 600 U.S. 66, 69 (2023).

126.    Because her comment and GIF were, at most, "rhetorical hyperbole" or "political hyperbole" protected by the First Amendment, and because it could not reasonably be understood as a "true threat," the comment and GIF did not supply probable cause for any arrest, search, seizure, or criminal charges.

127.    The actions of TPD's officers, employees, and agents, taken against Plaintiff would chill a person of ordinary firmness from continuing to engage in protected activity.

128.    Those actions include opening a criminal investigation, obtaining warrants, surveilling Plaintiff's home, arresting her, interrogating her, searching her residence, seizing her digital devices, transporting her over one hundred miles away from her home to Tempe,

17

booking her into jail, publicly releasing her mugshot, publicly labeling her as someone who makes criminal threats against public spaces and officials, and referring her for felony prosecution.

129.    Plaintiff's Facebook comment was a substantial or motivating factor in the actions of TPD's officers, employees, and agents.

## COUNT 2

**(Fourth Amendment Unreasonable Search of Person, Residence, and Vehicle, 42 U.S.C. § 1983)**
**Defendant City of Tempe**

130.    Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

131.    Plaintiff's federal claims are brought under 42 U.S.C. § 1983 against Defendant City of Tempe.  For each federal claim, Plaintiff alleges both (1) the violation of a particular constitutional right, and (2) municipal liability under *Monell v. N.Y.C. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978) because the violation was caused by City policy, custom, or practice, and was later ratified by a final policymaker, including the Chief of Police.  The City's *Monell* liability is pled fully in Count 5.

132.    Under the Fourth Amendment, a person has the right to be free from an unreasonable search of her person, residence, and vehicle.  The first question in determining the reasonableness of a search is "whether the . . . action was justified at its inception[.]"  *C.B. v. City of Sonora*, 769 F.3d 1005, 1023 (9th Cir. 2014) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341–42 (1985)).  Probable cause for a search warrant only exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that. . . evidence of a crime will be found."  *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

133.    The City, through the officers, employees, and agents of TPD, intentionally searched Plaintiff's person, residence, and vehicle.

134.    The searches were unjustified, and therefore unreasonable, from their inception.

18

135.   According to Detective Guajardo's report, the search warrant affidavit is "sealed outside the public record by the courts."  Upon information and belief, the search warrant affidavit was based on the same facts set forth in TPD's reports, specifically Plaintiff's Facebook comment and the accompanying *Game of Thrones* GIF.

136.   Because her comment and GIF were, at most, "rhetorical hyperbole" or "political hyperbole" protected by the First Amendment, and because it could not reasonably be understood as a "true threat," the comment and GIF did not supply probable cause for any search of Plaintiff's person, residence, or vehicle.

137.   Because there was no probable cause to search Plaintiff's person, residence, or vehicle, the searches were unreasonable.

### COUNT 3

**(Fourth Amendment Unreasonable Seizure of Person and Property, 42 U.S.C. § 1983)**
**Defendant City of Tempe**

138.   Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

139.   Plaintiff's federal claims are brought under 42 U.S.C. § 1983 against Defendant City of Tempe.  For each federal claim, Plaintiff alleges both (1) the violation of a particular constitutional right, and (2) municipal liability under *Monell v. N.Y.C. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978) because the violation was caused by City policy, custom, or practice, and was later ratified by a final policymaker, including the Chief of Police.  The City's *Monell* liability is pled fully in Count 5.

140.   Under the Fourth Amendment, a person has the right to be free from an unreasonable seizure of her person and property.

141.   The City, through the officers, employees, and agents of TPD, intentionally seized Plaintiff's person and property.

142.   The seizures were unjustified, and therefore unreasonable, from their inception.

143. According to Detective Guajardo's report, the search warrant affidavit is "sealed outside the public record by the courts." Upon information and belief, the search warrant affidavit was based on the same facts set forth in TPD's reports, specifically Plaintiff's Facebook comment and the accompanying *Game of Thrones* GIF.

144. Because her comment and GIF were, at most, "rhetorical hyperbole" or "political hyperbole" protected by the First Amendment, and because it could not reasonably be understood as a "true threat," the comment and GIF did not supply probable cause for any seizure of Plaintiff's person or property.

145. Because there was no probable cause to seize Plaintiff's person or property, the seizures were unreasonable.

## COUNT 4

**(Fourteenth Amendment Due Process Stigma-Plus, 42 U.S.C. § 1983)**
**Defendant City of Tempe**

146. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

147. Plaintiff's federal claims are brought under 42 U.S.C. § 1983 against Defendant City of Tempe. For each federal claim, Plaintiff alleges both (1) the violation of a particular constitutional right, and (2) municipal liability under *Monell v. N.Y.C. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978) because the violation was caused by City policy, custom, or practice, and was later ratified by a final policymaker, including the Chief of Police. The City's *Monell* liability is pled fully in Count 5.

148. Under the Fourteenth Amendment, "a state may not deprive a person of his liberty interest 'to engage in any of the common occupations of life' without due process of the law." *Campanelli v. Bockrath*, 100 F.3d 1476, 1478 (9th Cir. 1996) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 572–73 (1972)).

149. To prove a Fourteenth Amendment Due Process "Stigma-Plus" claim, "plaintiffs must establish: (1) the public disclosure of a stigmatizing statement by a state actor; (2) the

accuracy of which is contested; (3) plus the denial of some more tangible interest." *Chaudhry v. Aragón*, 68 F.4th 1161, 1171 (9th Cir. 2023).

150. The City publicly disclosed stigmatizing statements about Plaintiff on September 24, 2025, when it announced her arrest, released her mugshot, and posted a press release on its Facebook page. In that statement, the City asserted that Plaintiff's "social media post threatened the safety of an August Tempe City Council meeting," and quoted TPD Chief McCoy as stating that "[t]hreats like this not only endanger lives, they disrupt civic engagement and silence the voices of the people we serve," and that TPD would "not allow intimidation to interfere with democracy in our city."

151. Between September 24, 2025, and early December 2025, TPD Chief McCoy continued to publicly defend TPD's response and to stigmatize Plaintiff by characterizing Plaintiff's Facebook comment as a threat. In a November 23, 2025 interview, TPD Chief McCoy stated that "at the end of the day, it was Kathleen Tierney that made a threat through social media that was taken very seriously by the recipients of it and by law enforcement." He further stated that TPD "handled the incident responsibly[.]". In a separate public statement, TPD Chief McCoy again defended TPD's response, stating that "[w]henever we see threats, we take them seriously," because "acts of violence are carried out, whether they're mass shootings or bombings," and that TPD's "team made the right decision based on the information they had."

152. The City again disclosed stigmatizing statements about Plaintiff in a press release dated December 11, 2025, after the Maricopa County Attorney declined to prosecute Plaintiff. The City stated that it "disagree[d] with the County Attorney's decision," continued to describe Plaintiff's Facebook comment as an "anonymous online post that looked like a direct threat," and claimed that TPD "followed the facts where they led: to the door of the individual who created and posted the image that caused the Council meeting to be evacuated." The City further stated that its "team acted appropriately" and that Tempe would "continue to

take every threat seriously," thereby continuing to publicly associate Plaintiff with a supposed threat to public safety even after prosecutors declined to bring charges.

153. The City's next stigmatizing statements about Plaintiff were publicly disclosed in another press release on February 27, 2026, in response to her notice of claim. In that statement, the City asserted that the cancellation of the August 28 City Council meeting and the investigation of Plaintiff were "made in response to information that was assessed as a credible public safety concern." The City further stated that its search warrants were approved by judges, that TPD "followed established procedures," that Plaintiff "was treated no differently than any other member of the community under similar circumstances," and that "[t]he safety of residents, city employees, and elected officials remains the City's highest priority."

154. The gist and sting of the February 27, 2026 statement was that Plaintiff's Facebook post created a credible danger to residents, City employees, and elected officials, and that the City would respond the same way to any other citizen who engaged in similar speech.

155. Plaintiff contests the accuracy of each of the City's stigmatizing statements. Plaintiff's Facebook comment and GIF were, at most, protected "rhetorical hyperbole" or "political hyperbole" and could not reasonably be understood as a "true threat." Plaintiff did not threaten anyone, endanger lives, interfere with democracy, create a credible public-safety danger, or place residents, City employees, or elected officials in danger.

156. The City's stigmatizing statements resulted in the denial of her tangible interest in engaging in her occupation. Plaintiff lost her $150,000-per-year public affairs position within days of the City's press release detailing her arrest. The City's statements seriously damaged Plaintiff's professional reputation in public affairs, fundraising, and political campaigning, a field that depends on credibility, public trust, and goodwill.

157.  Since her termination, Plaintiff has experienced a protracted interruption of gainful employment and has been unable to obtain comparable full-time employment in her profession.

## COUNT 5

**(*Monell* Liability – Policy, Custom, or Practice and Final Policymaker Ratification, 42 U.S.C. § 1983)**
**Defendant City of Tempe**

158.  Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

159.  Under *Monell v. N.Y.C. Dep't of Soc. Svcs.*, 436 U.S. 658, 690–91 (1978), Defendant City of Tempe is liable for the actions of TPD's officers, employees, and agents taken pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the action is made "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels."

160.  The City, including TPD's officers, employees, and agents, acted under the color of state law when they opened a criminal investigation into Plaintiff, obtained warrants, surveilled Plaintiff's home, arrested her, interrogated her, searched her residence, seized her digital devices, transported her over one hundred miles away from her home to Tempe, booked her into jail, publicly released her mugshot, publicly labeled her as someone who makes criminal threats against public spaces and officials, and referred her for felony prosecution.

161.  The acts of the City, including TPD's officers, employees, and agents, deprived Plaintiff of her First, Fourth, and Fourteenth Amendment rights.

162.  The City, including TPD's officers, employees, and agents, acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the City.

23

163.    The City's official policy or widespread or longstanding practice or custom caused the deprivation of Plaintiff's First, Fourth, and Fourteenth Amendment rights by the City, including TPD's officers, employees, and agents.

164.    The City's own public statements confirm that its treatment of Plaintiff was consistent with how the City and TPD handle political speech like Plaintiff's Facebook comment and GIF.

165.    After the Maricopa County Attorney declined to prosecute Plaintiff, the City stated in its December 11, 2025 statement that it "disagree[d] with the County Attorney's decision," that treating Plaintiff's Facebook comment as a threat remained "the right call," and that TPD investigators "followed the facts where they led."

166.    The City's February 27, 2026 statement further confirmed that TPD's conduct was consistent with City policy, procedure, and custom.  In that statement, the City asserted that TPD "followed established procedures" and that Plaintiff "was treated no differently than any other member of the community under similar circumstances."

167.    Additionally, a municipality can be liable for an isolated constitutional violation if a final policymaker "ratified" a subordinate's actions. *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

168.    TPD Chief McCoy is a final policymaker for the City concerning TPD's law enforcement operations and TPD's public communications.  The Chief of Police "leads the men and women of the Tempe Police Department," and "provides overall leadership, vision, and direction for the department."

169.    TPD Chief McCoy knew of and specifically made a deliberate choice to publicly approve the actions of TPD's officers, employees, and agents, and the basis for those actions.

170.    The City's September 24, 2025 press release quotes TPD Chief McCoy in which he ratified the actions of TPD's officers, employees, and agents, saying, "This arrest demonstrates [TPD's] unwavering commitment to protecting the safety of our community members and elected leaders."

24

171.   In public interviews, TPD Chief McCoy stated that TPD handled the incident responsibly, and that TPD's "team made the right decision based on the information they had."

### COUNT 6

**(Common Law Defamation)**
**Defendant City of Tempe**

172.   Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

173.   The City made and published defamatory statements of fact about Plaintiff on September 24, 2025, when it announced her arrest and posted a press release on its Facebook page.  In that statement, the City asserted that Plaintiff's "social media post threatened the safety of an August Tempe City Council meeting," and quoted TPD Chief McCoy as stating that "[t]hreats like this not only endanger lives, they disrupt civic engagement and silence the voices of the people we serve," and that TPD would "not allow intimidation to interfere with democracy in our city."

174.   Between September 24, 2025, and early December 2025, the City, through TPD Chief McCoy, continued to defame Plaintiff by characterizing Plaintiff's Facebook comment as a threat.  In a November 23, 2025 interview, TPD Chief McCoy stated that "at the end of the day, it was Kathleen Tierney that made a threat through social media," and that "[w]henever we see threats, we take them seriously," because "acts of violence are carried out, whether they're mass shootings or bombings," and that TPD's "team made the right decision based on the information they had."

175.   The City again published defamatory statements about Plaintiff in a press release dated December 11, 2025, after the Maricopa County Attorney declined to prosecute Plaintiff. The City continued to describe Plaintiff's Facebook comment as an "anonymous online post that looked like a direct threat."  The City further stated that it would "continue to take every threat seriously," thereby continuing to publicly associate Plaintiff with a supposed threat to public safety even after prosecutors declined to bring charges.

176.   The City's next defamatory statements about Plaintiff were published in another press release on February 27, 2026, in response to her Notice of Claim.  The gist and sting of the February 27, 2026 statement was that Plaintiff's Facebook post created a credible danger to residents, City employees, and elected officials, and that the City would respond the same way to any other citizen who engaged in similar speech.

177.   The City's statements that Ms. Tierney made a threat against anyone or any place were false.  At the time the City made, said, or wrote these statements, it knew that the statements were false or acted in reckless disregard of whether the statements were true or false because her comment and GIF were, at most, "rhetorical hyperbole" or "political hyperbole" protected by the First Amendment, and because it could not reasonably be understood as a "true threat."

178.   The City's statements caused Plaintiff to be damaged.

### COUNT 7

**(Common Law False Arrest / Imprisonment)**
**Defendant City of Tempe**

179.   Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

180.   The City, through TPD's officers, employees, and agents, acted intentionally to restrain Plaintiff to an area within their control.

181.   The City, through TPD's officers, employees, and agents, acted without lawful authority and without Plaintiff's consent, namely, without probable cause or other justification because her comment and GIF were, at most, "rhetorical hyperbole" or "political hyperbole" protected by the First Amendment, and because it could not reasonably be understood as a "true threat."

182.   The City's acts resulted in the direct restraint of Plaintiff's liberty or freedom of movement, either by actual force or from Plaintiff's fear of force.

183.   Plaintiff was aware of and was harmed by the restraint.

26

## COUNT 8

### (Common Law Abuse of Process)
### Defendant City of Tempe

184. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

185. The City, through TPD's officers, employees, and agents, willfully used against Plaintiff judicially sanctioned search warrants authorizing TPD to search Plaintiff's residence and vehicle and to seize or obtain Plaintiff's cellphone, laptops, electronic devices, router information, electronic records, and digital data.

186. The City, through TPD's officers, employees, and agents, used that process in a wrongful manner that was not proper in the regular course of the proceedings, namely, without probable cause or other justification because her comment and GIF were, at most, "rhetorical hyperbole" or "political hyperbole" protected by the First Amendment, and because it could not reasonably be understood as a "true threat."

187. The City used that process primarily for an improper purpose or ulterior motive, namely, to harass and punish Plaintiff for speaking out against the City Council, as evidenced by TPD Chief McCoy's public statement that "[t]he lesson might have been to be careful with social-media posts, especially in connection with issues like the Tempe park ordinance revisions."

188. That improper purpose or ulterior motive is further evidenced by the City's December 11, 2025 statement that "[h]ad [Plaintiff], who consulted on multiple occasions with Tempe's former City Manager, come forward, this incident might have concluded differently."

189. The City's wrongful use of numerous search warrants caused Plaintiff injury, damage, loss, and harm.

### REQUESTED RELIEF

Plaintiff requests judgment against Defendants in an amount that will reasonably compensate Plaintiff, plus costs incurred in this action, attorneys' fees pursuant to 42 U.S.C. § 1988, and for such further relief as the Court deems proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff requests a jury trial on all claims so triable.

Respectfully submitted this 9th day of July 2026.

MILLER, PITT, FELDMAN & MCANALLY, P.C.

By:  */s/ Peter Timoleon Limperis*
Peter Timoleon Limperis
Max W. Larnerd
*Attorneys for Plaintiff*

28